1919, and $9,398.38 in 1920, on account of commissions paid to two of its officers on sales made by them.

The Commissioner allowed as deductions by the corporation, $26,-790.49 in 1919, and $25,842.82 in 1920, as salaries, commissions, and bonuses paid to its officers, and disallowed for 1919, $8,888.88, and $8,888.90 for 1920, on account of bonuses or additional compensation.

## DECISION.

The determination of the Commissioner is approved.

---

**Appeal of THE POTTS-TURNBULL ADVERTISING CO.**　　　**Docket No. 404.**

Under the conditions of fact existing in this appeal the taxpayer is not entitled to classification as a personal service corporation.

Submitted January 19, 1925; decided April 14, 1925.

*Wendell H. Cloud, Esq.,* for the taxpayer.

*J. A. Adams, Esq.,* for the Commissioner.

Before GRAUPNER, LITTLETON, and SMITH.

This appeal is taken from a deficiency in income and profits taxes of $7,718.63 for the calendar year 1918, based upon the disallowance of a claim that the taxpayer is a personal service corporation. From stipulations filed and the oral and documentary evidence submitted, the Board makes the following

### FINDINGS OF FACT.

1. The taxpayer is a Missouri corporation with its principal offices at 300 Gates Building, Kansas City, Mo. The company was incorporated, at the instance of Henry K. Turnbull, as "The Turnbull Business Development Company," under a certificate of incorporation dated July 19, 1910, with an authorized capital of $5,000, divided into 500 shares of stock of a par value of $10 each, 250 shares being preferred stock and 250 common stock. The stock was subscribed for as follows:

|  | Preferred shares. | Common shares. |
|---|---|---|
| Henry K. Turnbull | 205 | 249 |
| David M. Proctor | | 1 |
| Fred Wolferman | 10 | |
| P. S. Harris | 10 | |
| W. E. Rogers | 10 | |

The articles of incorporation recite that at least one-half of the capital stock was actually paid up in lawful money of the United States. The purposes for which the corporation was organized are set forth in its articles of incorporation, as follows:

To transact the business of advertising, promoting and developing the business of other corporations, partnerships, or individuals for hire, or upon commission, or otherwise, by and through the means of preparing advertising for other corporations, partnerships or individuals, and of advertising the business, commodities or other property, real, personal or mixed, of other corporations, partnerships, or individuals in newspapers, books, booklets, prospectuses, magazines, circulars, pamphlets or other similar literature and advertising medium, * * *.

2. On July 21, 1913, under authority of the Secretary of State of the State of Missouri, the name of the company was changed to "Potts-Turnbull Advertising Company." The capital stock of the corporation was in no way changed until December 31, 1919, when the Secretary of State issued a certificate authorizing the increase of the capital stock of the corporation from $5,000 to $100,000. This change was subsequent to the taxable year under consideration. In the increase under this authority, the par value of the shares was increased from $10 to $100 each, and the preferred stock was canceled and exchanged for common stock.

The articles of incorporation do not disclose any preferences given to preferred stock and the stockholders or directors have never, by by-laws or otherwise, made any distinction between the preferred and the common stock, except as to name, and no preferences have ever been given to the preferred stock by any legal action of record taken by the stockholders or directors of the company.

3. The capital stock of the corporation was held by the persons and in the amounts shown below as of the beginning and end of the year 1918:

| Stockholders. | Number of shares, first half of 1918. | Number, of shares Dec. 31, 1918. |
|---|---|---|
| Otto Barth...common.. | 50 | 50 |
| B. F. McGuirl, vice president...do... | 25 | 25 |
| H. E. Stewart (up to Dec. 1, 1918)...do... | 20 | |
| F. E. Whalen, secretary (up to July 1, 1918)...do... | 20 | |
| H. K. Turnbull, president, treasurer, and general manager...do... | 55 | 75 |
| H. K. Turnbull, president, treasurer, and general manager...preferred.. | 239 | 239 |
| F. S. Turnbull (20 additional shares from Dec. 1, 1918)...common.. | 80 | 100 |
| P. S. Harris...preferred.. | 10 | 10 |
| S. T. Balcom...do... | 1 | 1 |
| | 500 | 500 |

F. S. Turnbull, who was the wife of H. K. Turnbull, S. T. Balcom, who was a sister of H. K. Turnbull, and P. S. Harris, were the only stockholders who were not regularly engaged in the business affairs of the taxpayer in the year 1918. The others were regularly and actively engaged in the affairs of the taxpayer, without outside interests, and gave their time and efforts exclusively to the business of the taxpayer. The shares of stock standing in the name of F. S. Turnbull were gifts from her husband, H. K. Turnbull. Her stock certificates were never delivered to her, but were held in the possession of Turnbull at all times. The one share standing in the name of S. T. Balcom was given to her by her brother, Turnbull, to qualify her for a directorship, and the ten shares owned by P. S. Harris were subscribed for by him at the time the corporation was organized.

4. The gross business of the taxpayer, excluding fees for preparation of advertising, for the year 1918, was $507,949.51, and a detailed analysis discloses that the business was produced and handled by the several persons and in the amounts here listed:

| | |
|---|---:|
| W. J. Krebs | $86,155.09 |
| H. K. Turnbull | 266,181.88 |
| F. E. Whalen | 52,814.74 |
| Otto Barth | 69,140.15 |
| H. E. Stewart | 29,540.33 |
| B. F. McGuirl | 4,117.32 |
| | 507,949.51 |

The company paid publishers for advertising placed in publications the sum of $432,132.85. All of the persons above mentioned served in the capacity known in the taxpayer's business as "account executives" and, with the exception of Krebs, were all stockholders in the corporation. Krebs was employed on a commission basis. In the business conducted by the taxpayer an "account executive" is a person who handles the account of an advertiser; that is, he develops the advertising business of the advertiser with the taxpayer through solicitation, outlines the advertiser's program, determines the publications or advertising medium which should be used by the advertiser, supervises the writing of copy and the insertion of the advertising in the advertising medium.

Krebs was employed by the taxpayer in 1917, or early in 1918, with a view to obtaining a certain account which it was thought he could influence. This account was secured and has been held by the company. In securing this particular account, which was that of a firm by whom Krebs had been employed, Krebs was used merely as a means of contact, the details and technicalities incident to obtaining the account being handled by Turnbull. Krebs had had experience in the advertising department of a manufacturing concern and in selling advertising novelties for another firm, but he had not had experience in an advertising business such as was conducted by the taxpayer. During 1918 the company paid commissions to Krebs, as salary, in the sum of $3,434.18, he being the only employee other than a stockholder to whom a salary in excess of $2,000 was paid. He became a stockholder in 1919.

Turnbull, who owned 239 shares of preferred stock throughout the year, and 55 shares of common stock at the beginning and 75 shares of common at the end of the year, is shown to have produced and handled business to the amount of $266,181.88 of the total of $507,949.51. He was consulted and acted as adviser on all matters appertaining to obtaining new clients, planning advertising compaigns for advertisers, and originating new ideas for advertisements. He was president, treasurer, and general manager of the taxpayer; initiated the work for himself, the other stockholders and the employees; and was constantly consulted as to the details of the business. Prior to organizing "The Turnbull Business Development Company," he had been for five years in the advertising department of the Kansas City Journal, and previous to that he had been advertising manager of a dry goods company.

Barth had formerly been advertising manager for a publication known as the Kansas Farmer and was well versed in farming conditions.

Whalen was experienced in the mail order selling business.

5. The business of the taxpayer originated from contact between the account executive, or an officer of the corporation, and a representative of the concern from which it was desired to obtain business. Securing an account usually involved a detailed study and analysis by the taxpayer's representative of the advertiser's business, problems of distribution, sales policies, and the selection of the proper advertising mediums in order to present the product of the advertiser in a territory where results could be obtained.

The methods used may be summarized in the following examples: Preceding the acquisition of one of the taxpayer's major accounts and as a result of conferences with the advertiser, Turnbull made a trip to New York and obtained a number of sketches to show his ideas for a change of methods in advertising the product manufactured by the advertiser, whose account it was desired to acquire. The advertiser was a manufacturer of soap, who made a laundry soap and a toilet soap. This advertising had not been productive of the best results. Turnbull, through his experience and imagination, devised a series of illustrations which detracted from the labor of using laundry soap and centered attention on the attractive results of cleanliness. These ideas were visualized by a commercial artist and not only brought the advertising account to the taxpayer, but increased sales for the advertiser. In another of the major accounts, which was that of a fur buyer, Turnbull, after a conference with the advertiser, selected illustrations of various fur-bearing animals and constructed an illustrated narrative showing methods of hunting and trapping and the profits that might be made therefrom. These were suggested as a means of more appealing publicity for the advertiser. This account was secured, and the first insertion of an advertisement in a weekly paper, through the taxpayer company, resulted in about 6,000 inquiries regarding the advertiser's product at a cost of approximately 11 cents each, whereas by the method formerly used by the advertiser, the inquiries received had cost from 50 to 60 cents each. In securing the account of a manufacturer of lamps which resulted in one of the taxpayer's larger accounts, the stockholder representative of the taxpayer designed a new and more attractive style of a lamp shade for the advertiser and recommended a different sales plan, which resulted in an increase of annual sales from a few hundred thousand dollars to over four million dollars in 1924.

6. The representative of the taxpayer corporation handling the account of the advertiser made for his own purpose a memorandum of the advertising to be placed over a particular period by the advertiser. No signed orders from the advertiser were taken by the taxpayer, with the possible exception of instructions contained in letters from advertisers. After securing the account of an advertiser, the account executive or officer handling the account made out an "Order Memo," which was transmitted to the order clerk. A regular printed form was provided for this purpose, but in some instances a memorandum was furnished the order clerk either verbally or in some way other than by the use of the regular form. The order clerk then made out an order to the publisher on a printed form in use by the taxpayer, which bore a specific number, directing the insertion of certain copy in one or more certain issues of the

publication to which the order was directed. After the orders addressed to the publications were made out it was the practice of the company to mail to the advertiser a confirmation of the advertising placed. This confirmation was made out on a printed form designated as " Record of Advertising Order." This record was made and furnished the advertiser by the order clerk as a matter of routine without instruction from the account executive or officers of the company. There was then made out for the use of the taxpayer's accounting department a loose-leaf sheet for each customer, which was filed in a special binder designated " Record of Advertising Placed." As the next step in handling the account, a bill made up by the accounting department from the " Records of Advertising Placed " was rendered the customer.

7. During the year 1918 the following salaries were paid to stockholders:

| | |
|---|---:|
| Otto Barth | $2, 600. 00 |
| B. F. McGuirl | 2, 600. 00 |
| H. E. Stewart | 2, 352. 50 |
| F. E. Whalen | 1, 060. 00 |
| H. K. Turnbull | 12, 000. 00 |
| Total | 20, 612. 50 |

These stockholders were regularly and actively engaged in the affairs of the corporation without outside interests, giving their time to the business, and to the affairs of the corporation exclusively. Turnbull was the active and direct manager of the business. He not only brought in more than 50 per cent of the advertising employments, but guided the activities of the concern. The other stockholders conferred with him and followed the policies which he directed.

8. The following schedule sets forth the income and expense of the taxpayer for the year 1918:

| | | |
|---|---:|---:|
| Income: | | |
| Commission on advertising | $47, 967. 02 | |
| Art | 1, 630. 81 | |
| Cash discount | 11, 628. 45 | |
| Commission on engraving | 1, 598. 33 | |
| Fees for preparation of advertising | 23, 516. 28 | |
| | | $86. 340. 89 |
| Expense: | | |
| Rent, phones, postage, etc | 3, 780. 34 | |
| Travel | 981. 85 | |
| Salaries (not including stockholders) | 23, 093. 42 | |
| Discount | 11, 394. 49 | |
| Art | 666. 58 | |
| Officers' salaries | 20, 612. 50 | |
| Interest | 299. 28 | |
| Taxes | 392. 86 | |
| Bad debts | 3, 136. 01 | |
| Depreciation | 684. 25 | |
| | | 65, 041. 58 |
| Net income | | 21, 299. 31 |

The commissions on advertising placed varied during the year, ranging from 10 per cent to 15 per cent. The commission on engraving was on the basis of 10 per cent of sales. The art department sustained a loss of $668.58 during the year, which should be charged

against the total commissions set out for the art department. Included in the amount set out as alleged commissions on advertising is an item of $394.45, representing bad debts recovered. An analysis of the discount account—that is, all discounts taken and allowed by the company during the year—discloses that the company realized a net profit from discounts in the amount of $233.96.

9. The balance sheets of the corporation, as of the beginning and end of 1918, are as follows:

### Beginning of year 1918.

| ASSETS. | | LIABILITIES. | |
|---|---|---|---|
| Cash | $4,997.67 | Stock | $5,000.00 |
| Furniture | 1,911.11 | Undivided surplus | 10,000.00 |
| Accounts receivable | 31,830.56 | Accounts payable | 23,739.34 |
| Total | 38,739.34 | Total | 38,739.34 |

### End of year 1918.

| ASSETS. | | LIABILITIES. | |
|---|---|---|---|
| Bills receivable | $15,000.00 | Stock | $5,000.00 |
| Furniture | 1,207.86 | Undivided surplus | 10,000.00 |
| Accounts receivable | 55,717.57 | Loans | 2,000.00 |
| Stationery and supplies | 386.79 | Overdraft | 11,650.95 |
| | | Reserved for taxes | 2,162.02 |
| | | Accounts payable | 42,399.25 |
| Total | 73,212.22 | Total | 73,212.22 |

The account "bills receivable," amounting to $15,000, was made up of notes of two advertisers, largely one advertiser, taken during the last days of December and payable during the early part of January, 1919. The notes were taken from advertisers maintaining current accounts running into considerable volume. They were not set up on the books of the taxpayer until December 31, 1918, and were paid before the end of January, 1919. The "accounts receivable" represented advertisers' current accounts billed out to advertisers, against which "accounts payable" represented largely amounts due publishers for advertising placed. The amount of $11,650.95, designated "overdraft," was due to the issuance of checks in the last days of December, 1918, for the purpose of paying all possible advertising accounts before the close of the year. This overdraft was almost immediately absorbed after the first of January, 1919. The amount of $2,000, designated "loans," represented money borrowed from the bank in November, 1918, and which was repaid in 1919. At the close of business December 31, 1918, and before the distribution to him of his share of earnings of the corporation, the individual account of H. K. Turnbull was overdrawn some $12,000.

10. The company had no contracts with publishers for the purchase of space in bulk, but an individual order was placed with each separate publication for space to be used by each advertiser, and the orders for different advertisers bore no relation to each other. The company made no written contracts with the advertising mediums in which it placed advertising, nor did the advertising

mediums make any written contracts with the taxpayer, except in the case of the Curtis Publishing Co. In this case the Curtis Publishing Co., in an agreement dated April 19, 1917, designated "Agency Terms," agreed to "accept orders from" the taxpayer upon the conditions and terms enumerated therein. When the company was accorded what was known as "agency recognition," which was usually done by way of a letter from the publisher, or verbal information, that fact established the right of the company to what is termed by publishers as "commissions" or "agency differential" and "cash discounts" allowed by the publishers. Space in publications was not ordered by the company in advance of bona fide orders received from advertisers, and orders were given the publisher in the name of the taxpayer's client. The orders were subject to cancellation at any time. The agency did not acquire any right or title to any advertising space and did not receive the benefit of what are known as "preferred positions," but this benefit ran directly to the advertiser even though the advertiser changed agencies or handled his own advertising direct with the publisher.

11. In practically all instances the publications or advertising mediums held the taxpayer to strict accountability for the payment of accounts due the publishers on account of advertising placed by the taxpayer for its advertisers. In two instances certain notes of the advertiser made payable direct to the publishers were negotiated to the publishers by the taxpayer for advertising placed in the publications by the taxpayer for the advertisers. As a general rule the taxpayer had on hand sufficient funds realized from advertisers who paid accounts in advance or promptly so as to be able invariably to take advantage of the cash discounts allowed the taxpayer by publishers and to carry the accounts of those advertisers who had not paid their bills to the taxpayer before the taxpayer was required to pay the publisher.

12. Bills received from publishers for space used by the taxpayer's clients were checked against the "Record of Advertising Placed" maintained by the taxpayer for correctness as to space used, number of insertions, gross rate, and proper allowance of what was termed "Advertising Agency Commissions" or "Agency Differential" and "Cash Discount." When the bills were found to be correct they were passed for payment, provided the proper proof of publication had been furnished. With practically no exception the advertisers were allowed the same rate of discount as was taken by the taxpayer. In the case of two or three advertisers, where little or no copy service was required and practically no outlay in traveling expenses, a special and arbitrary cash discount, slightly higher than that taken by the taxpayer, was arranged.

## DECISION.

The taxpayer is not a personal service corporation. Final settlement will be made upon stipulation or upon ten days' notice from either party.